## ALICE YOUNG v. A. H. WIGGS.

Western Section.   May 8, 1931.

Petition for Certiorari denied by Supreme Court.   December 19, 1931.

N. R. Barham, H. H. Waldrop, and Thomas Harris, all of Jackson, for appellant.

Greer & Greer, of Dyersburg, for appellee.

SENTER, J. The original bill filed in this cause, which is very elaborate, alleges in substance that complainant placed with the defendant certain land notes for collection; that the defendant was then and is a practicing attorney at Linden, Perry County, Tennessee; that these several notes placed with the defendant, as her attorney, for collection, amounted in the aggregate to the sum of $6,922 with interest at the rate of 6% per annum from date, the interest payable annually, and provided for attorneys fees. These several notes represented the purchase price for certain lands con-

veyed to P. A. Beasley, et al., that said land notes were first placed with another attorney, Mr. Jno. Greer, for collection, and were subsequently placed with the defendant. The bill alleges that certain amounts were paid on the notes, to the former attorney, amounting in all to about $700; and that two payments, one for the sum of $1200, paid on January 11, 1918, and one for the sum of $800 paid on May 1, 1919, were paid to the defendant as her attorney, according to the information of complainant. The bill alleges that the complainant has never properly accounted to her for the amounts collected by him on said notes, and that he has abused her confidence, and has taken advantage of her, and that he has been guilty of gross fraud and deception in handling her affairs as her attorney. The bill alleges that the defendant has purchased the lands from Beasley, and now claims to be the owner of the lands under two separate deeds, the first conveying a one-half undivided interest to him, and subsequently a deed from Beasley to defendant conveying the other one-half undivided interest, and that the defendant still has in his possession the notes which she turned over to him for collection and that he has not accounted to her for the notes, or for the collections made on the same. The original bill charges gross fraud upon the part of the defendant.

The bill further alleges that in addition to the lands notes which she turned over to the defendant for collection, that under the provisions of the will of her deceased husband she was given a life estate in a farm at Pope, Tennessee, and that her son, Sam P. Young, was given a life estate in said farm, subject to the life estate of complainant. The bill alleges that in 1919 she and her son sold the life estate in this last mentioned property to one W. C. Nix for the sum of $2500, and that this money was paid by Nix to the defendant, as her attorney. The bill avers, however, that about the time of the sale of the life estate in this farm to Nix she purchased a small home in Jackson, Tennessee, for the sum of $2,000, and that the defendant assisted her in paying for same and that it is probable that the $2500 was used in part in paying for the home in Jackson, and that the defendant has not accounted for the balance of the money received by him from Nix. She charges that the land notes had been in possession of the defendant since they were originally turned over to him in 1917 or 1918. The bill alleges that the records in the Register's office of Perry County, Tennessee, disclose a certain instrument which purports to be a quit-claim deed from complainant to defendant of all her interest in the farm sold to Beasley, said instrument dated January 4, 1922. Complainant states that she has no recollection of signing or acknowledging such an instrument, and if she did so the

contents of same were not made known to her, and she was misled, deceived and defrauded by defendant and induced to sign and acknowledge an instrument the contents of which were not explained to her, nor which she understood, and that she would not have signed same had she known what it contained. She alleges that she had confidence in the defendant and relied upon him to treat her properly and fairly. The bill alleges that she is an uneducated woman and that the defendant took advantage of her ignorance and weakness. The bill further alleges that she did not know of the existence of such an instrument until shortly before she filed the bill when she was informed that the same had been recorded in the Register's Office of Perry County.

The bill further alleges that she had recently discovered that the records of Perry County showed that on January 4, 1922, the defendant and his wife executed a trust deed to W. C. Nix, as trustee, to secure the complainant in the sum of $2282.18. She alleges in the bill that she did not understand at the time that said trust deed was upon the Beasley farm, and that she did not know until recently that the defendant even claimed to be the owner of said farm, and alleges that she did not know or understand that this purported to be a settlement for, or even a payment upon the said Beasley notes. She alleges that said sum of $2282.18 was only a small portion of the amount due her upon said Beasley notes and owing to her by defendant from other sources at the time the said trust deed was given, and that if said trust deed purports to correctly recite the amount actually due by defendant to complainant as of date January 4, 1922, said recitation is false and does not correctly set forth the true agreement between the parties. The bill alleges that since said date of January 4, 1922, the defendant has made several payments of $25 each to her, but she does not know how many payments nor when same were made, but that the defendant has discontinued making any payments to her. She denies that the defendant had ever made any settlement with her and denies that he has rendered any legal service to her at her instance or request, or that he is entitled to any credit upon any of said notes or any other indebtedness, except his commission upon the amount turned over to her.

By the prayer of the bill she prays that the defendant be required to produce all notes, papers and receipts which he has in his possession and which in any way relates to the transactions between the parties; that the court decree that said Beasley notes amounting to $6922, together with all accrued interest thereon, be decreed to be in full force and effect and due and unpaid, and that the lien to secure same be decreed to be valid, outstanding and

unreleased and the complainant have a decree against defendant for the full amount thereof with interest; that the court decree that the purported quit claim deed of January 4, 1922, be decreed a fraud and a nullity; that it be further decreed that the conveyances from P. A. Beasley to the defendant vested the title in defendant as trustee only for complainant, and that he now holds said lands as trustee for complainant; that the defendant be required to make a full accounting for all rents and profits and income received by him directly or indirectly and that she be given a decree against him for the same, with interest thereon; that it be decreed that the trust deed of date January 4, 1922, is and was from its date void and of no effect, and that it be held that the same was a part of the fraudulent scheme of defendant to deprive complainant of her just rights and her property. She prayed for writs of attachment and injunction to restrain the defendant or his agents from collecting any further rents or from selling or encumbering said property, and for a receiver to take charge of said property to rent out and collect the rents and to care for the same.

The original bill was filed on November 23, 1928. The subpoena to answer was issued on November 27th, and was served on the defendant on December 13, 1928. The subpoena to answer was made returnable to the third Monday in December, 1928, that being a rule day of the court. An order pro confesso was taken against the defendant on February 4, 1929, and on the same day the complainant moved the court for a judgment pro confesso against the defendant, and the order pro confesso recited, "and it appearing to the court that said A. H. Wiggs is duly in court by service of subpoena requiring him to appear and defend on the first Monday in January, 1929, and that he had failed to make any defense to complainant's bill as required by the rules of this court, it is, therefore, ordered by the court that said bill be taken as confessed as to said A. H. Wiggs, and the cause set for hearing ex parte as to him."

At a subsequent day of the term the following decree was entered in the cause:

"This cause came on to be heard on this the 27th day of March, 1929, before the Hon. J. C. Hobbs, Chancellor, holding the Chancery Court for Perry County, Tennessee, upon the original bill of complainant, the judgment pro confesso heretofore taken and entered against the defendant, the exhibits to the original bill and the entire record in the cause; from all of which it does not sufficiently appear to the court just what the respective rights of the parties are, and no proof having been taken; but it does not appear to the court that the case is of

such nature that a very early adjudication is necessary. It is, therefore, ordered, adjudged and decreed by the court that this cause be and the same is here set for hearing on Friday, July 19, 1929, the same being an adjourned term of this court. . . ."

The decree then provides that the complainant have until June 1, 1929, to complete all her proof in chief, and that the defendant have until July 1, 1929, to complete his proof, and that complainant then have until July 15, 1929, to complete her rebuttal proof. The decree also provides for the appointment of a receiver to take charge of, manage and rent the property.

When the court reconvened on July 19, 1929, which was an adjourned session of the same term, the defendant presented an affidavit in the form of a petition that the order pro confesso previously taken against him be set aside and that the defendant be permitted to file an answer which he tendered with the affidavit. The decree setting aside the order pro confesso recites, "which petition was supported by the unsworn answer of the defendant, this day for the first time presented, and after hearing argument of counsel and fully considering the questions of law and fact presented by said petition and the record, the court is of the opinion that although the defendant is shown to have been negligent in making his defense to the bill filed in this cause, yet under the circumstances the defendant is entitled to have said order pro confesso set aside, and the defendant is permitted to file his said answer." This decree also recites that after this action was taken that the answer of defendant was sworn to.

This decree further recites that it is conceded for defendant "that the defendant is justly indebted to complainant in an unknown amount on account of the matters complained of in the original bill in this cause, but the facts not sufficiently appearing as to just what the respective rights of the parties are, it is ordered that each party be permitted to take proof, but since complainant has already taken proof in chief, the defendant will be permitted to take proof by deposition at any time upon proper notice, for a period of thirty days from the date of filing this decree; . . . and the complainant will be allowed thirty days after the expiration of the time allowed to the defendant in which to take rebuttal proof."

The complainant excepted to so much of the decree as set aside the order pro confesso, and in permitting the defendant to file answer and make defense. The exceptions were overruled.

The defendant filed an affidavit in support of his petition to have the order pro confesso set aside. This affidavit recited that at the

time the original bill was filed and the subpoena to answer was served on him, he was then engaged as a candidate for speaker of the State Senate of which he was then a member, and that his campaign for the speakership of the Senate engaged him until after the Senate was organized on the first Monday in January, 1929, and that he did not consider that it was necessary or proper for him to discontinue his campaign for the speakership of the Senate in order to file an answer. The affidavit further recited that as a member of the State Senate he was continuously engaged in the duties of that office until the legislature adjourned in April, 1929, which was after the order pro confesso had been taken against him; that he did not have any notice from the complainant or her attorneys of an intention to take an order pro confesso against him, and that his delay in tendering his answer was due to his service to the state as a member of the State Senate.

It appears that when this affidavit was presented the defendant also presented an elaborate answer which met the issues presented by the bill.

The answer of the defendant admits that the Beasley notes were turned over to him by complainant for collection. It admits that he made two collections, one of $1200 and one of $800 on these notes; that he collected these amounts from Beasley, the maker. The answer admits that the money coming into his hands upon a sale of the life interest amounted to $1500 for the life estate of complainant, and $1,000 for the life estate of her son, Sam Young, and that these amounts were paid to him by the purchaser, Nix. The answer denies all allegations of fraud or unfair treatment of complainant, and avers that he had not been guilty of any unfair treatment or fraud, but alleges that his conduct had been strictly ethical and proper. He alleges in his answer that he had advanced certain sums of money, setting same out, to the complainant and to her son; that in the purchase of the home for complainant at Jackson, he borrowed the money for her from the First National Bank of Dickson, Tennessee, and went on the note with complainant and her son to secure said loan, and that he put the land notes up as collateral security to the loan. He claims to have repaid the loan at the Bank of Dickson by using the $1500 which Nix paid to him for her life estate in the repayment of the $2,000 loan, and advanced the balance necessary to take up the note and the interest thereon. He admits that he purchased the farm from Beasley, and assumed the balance on the notes. He claims that he sold certain live stock, feedstuff, etc., to Sam Young with the consent of complainant and advanced to him certain moneys, and that in these transactions the complainant and Sam Young were indebted to him in 1920, the date of an alleged first settlement, in two amounts,

one for $1695 and the other for $1305, aggregating $3,000, and that complainant and Sam Young then gave to him receipts covering these amounts, and in the same instruments assigned to him $3000 of the Beasley notes. He denies the allegations in the bill that the complainant was not fully advised of the execution of the quit-claim deed made to him in January, 1922, and the execution by him of the trust deed to Nix securing the note evidencing the balance he was due her on the Beasley notes which he held.

At the hearing of the cause, after a voluminous amount of evidence had been taken, the Chancellor held that the receipts given by complainant and Sam Young in 1920 represented a settlement up to that time of the amounts which defendant had paid to complainant; and that the settlement of January, 1922, was a full and complete settlement of the matters between the parties, and held and decreed that complainant was estopped from denying said settlement, and held that the payments made by defendant since the settlement of January 4, 1922, reduced the amount which defendant was justly due and owing to complainant to the sum of $1190.24, and decreed a foreclosure of the trust deed on the Beasley land in the event said amount was not paid as provided by the decree.

To this decree the complainant excepted and prayed and was granted an appeal to this court, and has assigned numerous errors. The first two assignments are directed to the action of the court in setting aside the order pro confesso and permitting the defendant to answer the bill. Under the first and second assignments it is contended that the Chancellor did not have the jurisdictional right or power to set aside the decree. This contention proceeds upon the assumption that the decree in question, granting the order pro confesso, and fixing the time for the taking of proof, was a final decree. This contention cannot be sustained. It appears from the decree that the order pro confesso was granted, and it further appearing from the decree that the Chancellor, without proof, could not fix the amount of liability if any, because of the uncertain allegations in the bill. In that situation he postponed the hearing of the case until July 19, 1929, the decree reciting that it was an adjourned term, which would indicate that it was at the same term of the court. This would amount to but a passing of the case to a future date. It was not a final decree, it was more in the nature of an interlocutory order, passing the case to a date fixed for hearing. On that date the defendant presented his affidavit in support of his motion or petition that the order pro confesso be set aside, and that he be permitted to file an answer which he presented. It is true the answer was not actually sworn to at the time the affidavit was presented and the motion to set aside the pro confesso, but it

was sworn to immediately according to the recitations in the decree. The Chancellor had stated in the former order of March 27, 1929, that it did not appear that there was anything in the case that demanded immediate adjudication, or prompt adjudication. The matter of setting aside an order pro confesso is in the sound discretion of the Chancellor. On July 19, 1929, and on the same date that the defendant was permitted to file an answer, the complainant was permitted to amend the original bill by making Nix, the trustee in the trust deed, a party defendant. The legal title to the land was then in Nix by reason of the trust deed vesting the legal title in him. She was seeking to reach this land and to have her alleged lien securing the purchase notes, sold. Nix was not only a proper party but was a necessary party. The defendant was a member of the State Senate of 1929. The process was not served upon him until December 13, 1928. He was at that time a candidate for Speaker of the Senate, and according to his affidavit was in the midst of a campaign for the speakership. As a member of the State Senate during the winter and spring of 1929 he was continuously engaged as a member of the State Senate in the State Capitol at Nashville, and rendering official service to the state. These facts are set forth in his affidavit in support of his motion that the order pro confesso be set aside. The Chancellor had stated in the former interlocutory order that there was nothing in the case necessitating prompt adjudication. We cannot see that any of the rights of the complainant were in any way prejudiced by the action of the Chancellor in setting aside the pro confesso and permitting the filing of the answer by the defendant.

By the third assignment it is said that the court erred in placing upon complainant the burden of proof as to all matters; and in not placing upon the defendant the burden of establishing the fairness, good faith and honesty of the several transactions.

There is nothing in the decree of the Chancellor, or in the record, that indicates that he placed the burden of proof upon the complainant, or that he did not place the burden of proof upon the defendant of establishing the fairness, good faith and honesty in his dealings with the complainant.

The duty that an attorney owes to his client is of the highest and most sacred order. The attorney must at all times deal with his client openly, fairly, and honestly, and his conduct in the handling of the business of his client, especially where he is dealing with the affairs of his client, and dealing with his client, will be carefully scrutinized by the courts. Any unwarranted advantage or any unfairness by an attorney in dealing with his client should merit the severest condemnation, and we agree to the contention made by able counsel for appellant that in all transactions between an at-

torney and client the attorney is required to show that his conduct has been above just criticism. If his dealings with his client or with the property of his client is challenged, and his motives impugned, he should be prepared to show that his dealings have at all times been fair and honorable. However, we do not find anything in the final decree of the Chancellor in the cause that indicates that this rule was not observed by the Chancellor. A great mass of evidence was taken by the respective parties. Numerous documentary exhibits were filed by the parties and put in evidence.

The assignments of error are too numerous to be taken up and disposed of separately. The several assignments, are in the main directed to the action of the Chancellor in holding and decreeing that the alleged settlement of September 7, 1920, involving the receipt for $1695 and the receipt of the same date for $1305, represented a settlement between the parties as of that date, and in holding and decreeing that the settlement of January 4, 1922, operated as an estoppel to complainant for any amounts in excess of the balance remaining unpaid on that settlement. Other of the assignments of error challenge the action of the Chancellor in allowing certain items of credit to complainant. These are numerous items, and practically all of them are evidenced by checks and receipts.

The briefs of the respective parties are very elaborate, and many contentions are put forth on the facts involved. We have carefully examined the record in this case. We have examined the evidence with painstaking care, and especially in view of the fact that this is a suit by a woman client against her attorney with whom she had placed important matters. It would unduly and unnecessarily prolong this opinion to go into a detailed discussion of each separate transaction and alleged payment, and hence we will state the conclusions reached as to the real merits of the controversy.

Much has been said in the brief for complainant with reference to the mental condition of the complainant, and that she was an ignorant woman and easily imposed upon, and knew nothing of ordinary business affairs, and that she was weak-minded. We have examined her evidence in the record. She denies receiving various and sundry payments from the defendant, and denies the execution of certain instruments. She denies that she received and cashed certain checks. These documents are made exhibits. When she was confronted on cross-examination with many of these checks she denied that she had any knowledge of them, or that she had endorsed them or that she had received anything on them. It is shown clearly that she was mistaken in many instances, and her genuine signature appears on the back of several checks made payable to her. These she had denied. She denies that she was

familiar with the transactions of September 7, 1920, in which she signed the two receipts with her son, Sam Young. These receipts represented money paid to or for her by the defendant, and the numerous items making up the amounts were shown in the main by checks, tax receipts, and other evidences. Certain of the items represented amounts paid by defendant to her son and on account of her son. She disclaimed in her evidence any knowledge of those items or that she authorized any of them, or consented that they be charged against her. Yet, we think it clear from the record that she was fully conscious of all these matters, and with full knowledge of what the various items represented agreed that they were proper charges to be charged against her and covered by the receipts. The defendant collected $1200 at one time and $800 at another time on the Beasley land notes, which he held for collection. The record shows that he fully accounted for these amounts. He procured a loan from the Dickson bank for complainant and went on the note, this was for the sum of $2,000 which she desired to use in the purchase of a house and lot in Jackson. He collected $1500 from Nix, representing the amount which Nix paid for the life estate of complainant in the Pope property. He used this $1500 by applying the same as a credit to the $2,000 on the note at the bank of Dickson. He paid interest on the note at Dickson and produces the checks. The note was renewed at the bank at Dickson, and he paid the interest on the renewal note, as evidenced by his cancelled checks. This left something over $500 paid by him to the First National Bank at Dickson, after applying the $1500 realized from her life estate in the Pope farm. Shortly before the alleged settlement of September 7, 1920, he had purchased the one-half undivided interest of Beasley in the farm for which the land notes had been given. We think it clear from the record that at that time Beasley was in arrears with his payments on the notes and could not meet the payments as they respectively matured, and in this situation the defendant assumed the payment of about $3500 of these notes, the consideration recited in the deed for the one-half undivided interest was cash or its equivalent. He held these notes for collection. He had advanced to complainant considerable sums of money from time to time, as shown by the checks and receipts. It appears that on September 7, 1920, these amounts advanced to and for her and paid out by him either to her or on her account, amounted to $1695 in excess of the amount which he had collected from Beasley on the land notes. This included reasonable attorneys fees for his services in making the collections, shown by the record to have been 10%. And also a reasonable and proper fee in handling the transaction by which the life estate of complainant and her son was sold to Nix, and the several trips made

by him in connection with that transaction and also in investigating the title to the property at Jackson. For this service he charged $150. There is nothing in the record to indicate that this was not a reasonable and proper fee. It was included in the settlement of September 7, 1920, and she evidently agreed to it, as it was one of the items embraced in and covered by the receipt for $1695. Even if the Chancellor had gone behind that settlement, defendant was able to show and account for all of the items covered by the receipt, except probably about $80, and proper interest would have accounted for a considerable portion of that amount. In addition he testified that he had paid to her small amounts at different times for which he did not hold a receipt, but which she remembered and understood at the time of the settlement. So that, in the event the Chancellor had gone behind the receipt of $1695 of September 7, 1920, complainant properly accounted, as we think, by a very decided preponderance of the evidence, for all of that amount, except the amount of $80 as above stated. As to the other receipt dated September 7, 1920, this represented live stock, tools, feedstuff, money advanced and paid out by defendant for Sam Young, the son of complainant. The record shows that he was a reckless spendthrift, and has squandered all the money that he received from his father's estate. It is shown that he was frequently in trouble, and had been indicted in several cases and that the defendant represented him in these cases and that he also had represented him in a damage suit at Springfield, and had paid $70 for him in settlement of that matter, and all these items combined amounted to $1305. The receipt for the $1305 bears the genuine signature of the complainant, thereby evidencing her consent that the same be made a charge against her. In these receipts she not only acknowledges these sums, but she assigns to the defendant the amount represented by the respective receipts of the land notes, payment of which defendant had assumed in the purchase of the property from Beasley.

It appears that some time prior to January 4, 1922, complainant employed the law firm of Murray & Murray, of Jackson, Tennessee, to represent her in getting a settlement with the defendant. At the invitation of Murray & Murray, the defendant went to Jackson for the purpose of making a settlement with the complainant. At that time the complainant had present a Mr. Butler and his wife, who lived in the house with her, and also Mr. Nix, and all the parties met at the law offices of Murray & Murray. At that time complainant produced the receipts including the assignment of the $3,000 of the notes, and other documents. Mr. T. J. Murray, the junior member of the law firm of Murray & Murray, went fully into all the matters and the numerous transactions, and after allowing all

credits which he found to be fair and just, there remained a balance due and owing to complainant on the land notes which the defendant had assumed to pay of about $2280. It was then arranged and agreed between the parties that for the purpose of releasing the lien which complainant had in the Beasley land securing the notes, that she would execute a quit claim deed to the defendant, who had purchased the land from Beasley and had assumed the payment of these land notes, or the balance due thereon, and that the defendant would in turn execute a trust deed on the land to secure the $2280 notes representing the balance of the Beasley land notes and the balance which the defendant then owed to complainant. The trust deed was prepared by Mr. Murray, the attorney for complainant, and Nix was named as the trustee. It is clear from the record that Nix and Butler were especially friendly to complainant. Defendant took his deposition with reference to that settlement, and proved by him that complainant agreed to all the items and appeared satisfied, although Butler on cross-examination testified that in a former conversation that the defendant had referred to complainant as being soft. Mr. Murray, the attorney for complainant, who made all the figures and negotiated the settlement, is the present attorney-general of his judicial circuit, and a lawyer of high repute. It is contended by appellant that Murray was not her attorney in the matter, but was the attorney of the defendant. This contention cannot be sustained. Complainant had placed the matter of the settlement with Murray & Murray, as her attorney. It appears that the agreement was that the defendant would pay $25 per month on the note. He made these payments for many months, and the payments were made by check and the checks produced. It appears that after the note was prepared and after the settlement had been concluded that there was an item of State and County taxes which the defendant agreed to pay, and also $15 which defendant advanced to Murray & Murray, as the attorneys for complainant, and these items were then entered as a credit on the note.

A large portion of the brief and argument of counsel for complainant is devoted to a criticism of this alleged settlement. It is urgently insisted that the Chancellor was in error in applying any rule of estoppel against complainant because of the relation which existed between complainant and the defendant, that of attorney and client. At the time this settlement was made the defendant was not then the attorney for complainant. She was then represented by the law firm of Murray & Murray. However, the decree of the Chancellor could have well rested upon this settlement without applying any rule of estoppel. The various items that entered into the settlement were shown by other evidence. The numerous

checks, and receipts, and the evidence of the witnesses present, were all in evidence and before the Chancellor, and contained in the record. It is true that the complainant denies many of these items of credit, but she is clearly mistaken as to several of them, because they are evidenced by her genuine signature to the checks endorsed by her in collecting same through the banks. By a fair calculation of the various payments, shown by the record to have been made by the defendant, and numerous items entering into the settlement, we think it clear that the settlement represented the real amount which the defendant then owed to complainant, and this amount was carried into the note. The note had been lost by complainant, and she claimed to have no knowledge of it. However, the record shows conclusively that when the amount of balance was ascertained at the time of the settlement the defendant gave to her his note for the amount of the balance due to her, and agreed to pay same in monthly installments of $25. He executed the trust deed, and she in turn executed to him a quit-claim deed to the Beasley property. She denies any knowledge of that. It is said by the counsel of complainant that she had no knowledge of the execution of the quit-claim deed. She states in her sworn bill that if such a document was executed she had no knowledge of it and did not know its contents, and that it was obtained from her by fraud and deceit. This cannot be true under the overwhelming preponderance of the evidence. Her attorney, General T. J. Murray, and other witnesses present, do not support her in this contention. It is argued with much earnestness in the brief of counsel for complainant, that complainant is an ignorant woman, and weak-minded. This argument cuts both ways. If she is as ignorant and weak-minded as counsel claim her to be, her evidence would be entitled to but little weight, since her recollection and memory could not be very reliable. If she is a woman of average intelligence, she must have known of the contents of the instruments which she was signing and delivering. Several months after she executed the receipts of September 7, 1920, and in which she agreed to assign $3,000 of the Beasley notes to the defendant, she actually endorsed the assignment on the notes. Her son, Sam Young, now deceased, was present at the time the receipts were given, he signed the receipts with his mother. It is nowhere contended that he was ignorant, or that he was the subject of imposition. It does appear that he was a very reckless young man and that he was a spendthrift. He no doubt received and wasted all that went into his hands, either from the defendant or from the complainant, but he did so with the knowledge of his mother, the complainant. He stands in the record, by reason of his signature to these documents, as a witness against the complainant on all matters pertaining to the execution of the

receipts of September 7, 1920. He died in 1921 before the settlement of 1922, but his signature to the two receipts is a witness to the fact that complainant not only signed the documents, but that she understood the meaning of the same.

Giving full sanction to the insistence of able counsel for complainant, that an attorney in dealing with an illiterate or ignorant client, must exercise care, and deal fairly and honestly with his client, and fully concurring in the insistence that the highest rule and order of ethics should mark the conduct of the attorney, yet we are unable to find anything in the record to warrant a conclusion that the defendant has taken any unfair advantage of complainant, or has concealed any material facts, or has been guilty of any conduct entitling him to censure. He did discontinue the monthly payments prior to the bringing of this suit. This does not imply dishonesty or unfairness. He states his reasons for having discontinued the payments, and the amount which he owes was abundantly secured by a first mortgage on the land. We are also of the opinion that the Chancellor properly adjudged the costs.

The assignments of error are overruled and the decree of the Chancellor is affirmed, and the cause is remanded to the Chancery Court of Perry County for the carrying out of the decree.

Appellant will pay the cost of this appeal.

Heiskell and Owen, JJ., concur.